BERNARD LIGHTMAN AND BARBARA LIGHTMAN, ET AL. [1], Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Lightman v. Commissioner
Docket Nos. 9026-83, 9027-83, 1707-84
United States Tax Court
T.C. Memo 1985-315; 1985 Tax Ct. Memo LEXIS 317; 50 T.C.M. (CCH) 266; T.C.M. (RIA) 85315; June 27, 1985. *317 Held, charitable contribution deductions for 19 paintings determined to be significantly lower than claimed by petitioners. Held further, petitioners are not liable for additions to tax for negligence. J. Harold Flannery and Norman H. Wolfe, for the petitioners. John O'Brien, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: Respondent determined the following deficiencies and additions to Federal income tax for the calendar year 1979: Addition to Tax
Petitioners
Deficiency
Under Sec. 6653(a) [2] *318 Bernard and Barbara
$11,185
$582
Lightman (Lightman)
Morris and Rita
10,914
562
Kesselman (Kesselman)
Robert S. and Lorraine
10,088
521
Kingsbury (Kingsbury)
Due to concessions by respondent in docket Nos. 9026-83 and 9027-83, the two issues remaining for decision in each docket are: (1) The fair market value of 19 paintings donated to the El Paso Museum of Art in 1979; and (2) whether petitioners are liable for additions to tax under sec. 6653(a) as a consequence of claiming charitable contribution deductions based on valuation of the paintings greatly in excess of their costs. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners Lightman and Kingsbury were residents of Providence, Rhode Island when their respective petitions were filed. Petitioners Kesselman were residents of Sharon, Massachusetts when their petition was filed. During December 1978, petitioners individually purchased 19 oil paintings which they donated to the El Paso Museum of Art on December 30, 1979. On their 1979 Federal income tax returns, petitioners claimed charitable contribution deductions significantly greater than their costs. Attached to each return was an appraisal by John Aaron, a member of Appraisers Association of America, Inc. Said appraisals valued each painting in an amount equal to that claimed on the return. In the notice of deficiency issued in each case, respondent determined that petitioners' charitable contribution deductions were limited to their costs for the paintings. The following schedule sets forth the purchase prices and claimed deduction, by painting: Purchase
Claimed
Price
Deduction
Petitioners Lightman
Autumn in N.E.
$ 500
$2,800
Woods at Sunset
500
2,800
Apple Trees
500
2,800
Coastal Scene
500
2,800
Providence Market Scene
500
2,800
N.E. House
500
2,800
Providence Market Scene
1,000
7,500
$4,000
$24,300
Petitioners Kesselman
Winter Scene
$ 500
$ 2,500
Autumn Scene
500
2,500
Fort Scene
500
2,500
Sunset Scene
500
2,500
Spring Scene
500
2,500
Salt Marsh
2,400
12,500
$4,900
$25,000
Petitioners Kingsbury
Church Scene
$ 500
$ 2,500
Cape Cod Scene
500
2,500
Spring Scene
500
2,500
Abstract Landscape
500
2,500
Storm Scene
500
2,500
Two Pumpkins
2,400
12,500
$4,900
$25,000
With *319 the exception of "Salt Marsh" and "Two Pumpkins," the above identified paintings are the work of Mabel M. Woodward (Woodward), a turn of the century American impressionist painter. The majority of these paintings are small: three are 8 X 10 inches and ten are 8.5 X 10.5 inches. Of the remaining four, one is 9 X 11 inches, two are 10 X 13 inches and one is 16 X 20 inches. Woodward's paintings have been exhibited at the National Academy and The Chicago Art Institute. Local shows of her work have been held at the Boston, Rockport and Providence Art Clubs and the Providence Water Color Club. In the 1950's, the Shein family purchased 337 Woodward paintings from her estate for $5,000. Over the next 13 years, individual Woodward paintings were sold by Helen Shein. In 1972, the Voss Galleries of Boston, Inc. (Voss Galleries) held an exhibition of Woodward's work. From 1972 through 1975, the Voss Galleries sold approximately 35 Woodward paintings individually. Voss Galleries obtained prices of $1,500 to $2,500 for small Woodward paintings and up to $7,000 for larger works. After the death of his father in 1975, Edward Shein and his mother, Helen Shein, decided to liquidate the family's *320 remaining Woodward paintings. Edward Shein is a 19th-20th century fine arts dealer specializing in American paintings. Rather than individual sales, commencing in 1977 [3] *321 the Sheins sought to liquidate their Woodward paintings by selling them in lots at prices significantly lower than previously obtaining by Voss Galleries. The following table reflects such bulk sales by the Sheins in 1977, 1978 and 1979: No. of
Price
Paintings
Painting
Per
Total
Year
Purchaser
in Lot
Size
Painting
Price
1977
Deal
16
10 X 13     $500
$8,000
Shatkin
3
20 X 16     1,000
3,000
Shatkin
8
10 X 14 (1)
600
16 X 20 (7)
1,000
7,600
1978
Kingsbury
5
8-1/2 X 10-1/2 500
2,500
Kesselman
5
8-1/2 X 10-1/2 500
2,500
Lightman
8
8 X 10 (3)
500
9 X 11 (1)
500
10 X 13 (2)
500
16 X 20 (2)
1,000
5,000
1979
Kingsbury
36
8 X 10 (10)
N/A
8-1/2 X 11 (13)
N/A
10 X 13 (3)
N/A
16 X 20 (9)
N/A
24 X 30 (1)
N/A
20,000
The record does not reflect any other sales of Woodward paintings in 1977 or 1978. In 1979, the Sheins made one individual sale of a 34 X 26 inch painting for $7,000. Also in 1979, three Woodward paintings which had been purchased from the Sheins in 1977 were sold by the Brockton Art Museum as follows: 1977 Purchase
1979 Sale
Painting Size
Price
Price
10 X 14
$600
$400
16 X 20
1,000
1,000
16 X 20
1,000
650
After 1979, the record reflects only individual, as opposed to bulk, sales of Woodward paintings. In 1980, three paintings purchased in 1977 were resold for $100 to $400 less than their respective purchase prices. One large Woodward painting (28 X 24 inches) was sold by the Sheins in 1980 for $7,000. In 1981 and thereafter, individual Woodward paintings were sold or appraised for considerably higher prices than sales of comparably sized paintings sold in bulk in 1977 through 1979. Approximately 6 months prior to their donation, petitioners Kesselman lent their Woodward paintings to the El Paso Museum of Art. [4] One of these paintings, "Autumn Scene," was apparently damaged in transit to the Museum. The as yet undiscussed paintings contributed by petitioners Kesselman and Kingsbury to the El Paso Museum of Art in 1979 were the works of Karl Knaths, a 20th century American modern painter. Knaths' paintings have been or are exhibited in, among other institutions, the Corcoran Gallery of Art, the Hirshhorn Museum and Sculpture Garden, the National *322 Collection of Fine Arts of the Smithsonian Institution in Washington, D.C., the Metropolitan Museum of Art in New York City, the Boston Museum of Fine Arts and The Philadelphia Museum of Art. Karl Knaths died in 1971 and the Shawmut Bank of Cape Cod (Bank) was appointed executor of his estate and trustee of a trust established for his wife's support with the reversion to other designated income beneficiaries. At that time, 248 of Knaths' paintings were appraised and transferred to the trust. Between 1971 and 1978, the Bank sold some of these paintings through Paul Rosenberg & Co. in New York (Rosenberg Gallery), as well as making individual sales to other bank clients. Sales through the Rosenberg Gallery during this period netted the Bank over $5,000 per painting. The Bank's private sales were made pursuant to a price structure provided by the Rosenberg Gallery so as not to underprice the Gallery's sales efforts.Prices obtained by the Bank ranged from $3,500 to $6,000 per painting. In 1978, Mrs. Knaths died and the terms of the trust altered requiring a change in the composition of the trust to assets which would produce income. Consequently, a decision was made to dispose of the *323 approximately 100 remaining Knaths paintings. The Bank attempted to wholesale these paintings to numerous galleries but the best offer they received was approximately $1,000 per painting. In 1978, they sold the remaining paintings, in bulk, to Edward Shein for approximately $1,800 per painting. From 1978 through 1980, Edward Shein sought to resell the Knaths paintings individually at a $500 to $600 mark-up per painting. [5] In 1978, he resold four paintings for $2,400 each. [6] In 1979, he resold six paintings for $2,400 each. [7] In 1980, he resold eight paintings for $2,300 each. [8] Individual sales of Knaths paintings were also made by galleries during these years as follows: Sales
Year
Seller
Price
1978
Sotheby
$3,000       1978
Sotheby
3,600       1979
Christies
2,200       1979
Sotheby
9,000       1979
Rosenberg
[9] *324 9,900       (Resale of preceding
painting 1 mo. later)
1979
Rosenberg
9,075       1979
Sotheby
$3,000-5,000 (est.)
1980
Sotheby
4,000       1980
Sotheby
4,000       1980
Sotheby
2,575       1980
Sotheby
3,300       In 1981, Sotheby sold a Knaths painting entitled "Sunset-Salt Marsh" for $2,860 which was similar to the "Salt Marsh" painting donated by petitioners Kesselman to the El Paso Museum of Art in 1979. OPINION As to the deficiencies determined by respondent, the sole issue for decision relates to the amount of the deductions to which petitioners are entitled for their 1979 contributions to the El Paso Museum of Art. Section 170(a)(1) allows as a deduction any charitable contribution to an organization described in section 170(c). The parties agree that the El Paso Museum of Art is a qualified recipient under section 170(c). They further agree that the donated paintings were "capital gain property" within the meaning of section 170(b)(1)(C)(iv). Section 1.170A-1(c)(1), Income Tax Regs., provides that the amount of a charitable contribution made in property other than money shall be the fair market value of the property at the time of the contribution, reduced as provided in section 170(e)(1). Section 1.170A-1(c)(2), Income Tax Regs., *325 defines fair market value as "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts." See United States v. Cartwright,411 U.S. 546 (1973). As reflected in petitioners' 1979 Federal income tax returns and the notices of deficiency issued by respondent, the parties take extremely divergent positions as to the fair market values of the paintings as of December 30, 1979, the donation date. To a large extent, their differing valuations reflect their respective assessments of the evidentiary weight properly accorded: (1) Prices obtained at contemporary sales of the artists' work; and (2) petitioners' costs. In valuing the donated paintings for purposes of section 170, fair market value should be computed "on the price an ultimate consumer would pay," i.e., the retail price under the circumstances herein. Goldman v. Commissioner,388 F.2d 476, 478 (6th Cir. 1967), affg. 46 T.C. 136 (1966); Skripak v. Commissioner,84 T.C. 285, 321-322 (1985); Anselmo v. Commissioner,80 T.C. 872, 881-884 (1983), affd. 757 F.2d 1208 (11th Cir. 1985). Petitioners *326 argue that the only relevant retail prices in this case are those obtained in what they characterize as the "orderly private market" for the work of the specific artist, i.e., private treaty or gallery sales to art collectors or museums.[10] Petitioners assert that prices obtained at public auction sales should be disregarded as they represent a "disorderly market," do not reflect real value and are wholesale prices, i.e., many purchases at such sales are by art dealers for resale. We are not persuaded by petitioners' arguments and agree with respondent that auction sale prices are relevant to the determination of fair market value in this case. The controlling question is whether art auction sales represent sales to the ultimate consumer, not whether identical "consumer" prices are also available to dealers. It is clear that a significant number of auction sales are to consumers[11] *328 and this Court has previously recognized the significance of such sales in determining the fair market value of art. Mathias v. Commissioner,50 T.C. 994, 999 (1968). See Estate of Smith v. Commissioner,57 T.C. 650, 658 n.6 (1972), affd. 510 F.2d 479 (2d Cir. 1975); Peterson v. Commissioner,T.C. Memo. 1982-438; *327 Farber v. Commissioner,T.C. Memo. 1974-155, affd. by unpublished opinion (2d Cir. Nov. 20, 1975). As with gallery sales, in evaluating contemporary auction sales an assessment of the variations in numerous characteristics of the specific painting, including quality, size, subject matter and condition are necessary to determine if such sales are of comparable items. Unless comparability exists, contemporary sales can provide no guidance in valuing a given work. Petitioners also argue that their purchases of the donated paintings were at "wholesale, bulk, forced or distress sale rates" and their costs are, at best, poor indicators of fair market value. Although Edward Shein described himself as a "wholesale" dealer, we conclude that petitioners' purchases were at retail prices. None of the petitioners were art dealers and nothing in the record indicates that the prices they paid to the Sheins were other than retail. To the contrary, comparable, if not identical, prices were paid to the Sheins by other retail customers. Petitioners are correct that fair market value under the instant circumstances is to be determined on an individual, rather than bulk, basis. Chiu v. Commissioner,84 T.C. 722 (1985); Anselmo v. Commissioner,supra at 884. Petitioners purchased their Woodward paintings in lots, i.e., bulk and it appears that price concessions were made *329 by the Sheins to faciliate such bulk sales. Therefore, as to the Woodward paintings, petitioners' costs are not indicative of the value of the individual paintings. In contrast, petitioners Kesselman and Kingsburg each purchased only one Knaths painting in 1978 and, therefore, could not have obtained any concession for bulk purchases. The prices they paid reflect the fair market value of these individual paintings when purchased. While the simultaneous marketing of a number of Knaths paintings in 1978, 1979 and 1980, may have acted as a depressant on the prices of individual paintings, the lower available market prices are representative of the fair market value of Knaths' work during that period, not bulk prices. Estate of Smith v. Commissioner,supra;Jarre v. Commissioner,64 T.C. 183 (1975). Based on the record evidence, we also conclude that petitioners' purchases were not at forced or distress prices. The Sheins' decision to liquidate their remaining Woodward paintings does not indicate their subsequent sales were at forced or distress prices. Similarly, despite Edward Shein's testimony that he resold the Knaths' paintings "fast" to meet his bank obligations, the record *330 reflects only 18 sales by Shein over a 3-year period. Additionally, the prices Shein obtained were consistent with prices obtained for Knaths' work at auction sales during this period. Having addressed petitioners' general arguments as to valuation, [12] we now must determine the fair market values of the donated paintings. In support of their valuation of the Woodward paintings, petitioners rely on the testimony of their expert witness, Robert C. Vose, III (Vose). Vose has extensive experience as an art dealer and appraiser of 20th century American art. More importantly, *331 he has significant knowledge of, and extensive experience with, Woodward paintings. In fact, the Vose Gallery is recognized as the prominent gallery for Woodward's work. As the following chart reflects, Vose's valuation [13] *332 of the Woodward paintings were, generally, significantly lower than those claimed by petitioners on their returns and which they continue to assert should be allowed as deductions: [14]
Petitioners'
Petitioners'
Expert's
Return
Vose's
Difference
Valuation as
Percentage
Painting
Valuation
Valuation
in Valuations
of Return
Valuations
Autumn in N.E.
$2,800
$1,530
$1,270
55%
Woods at Sunset
$2,800
680
2,120
24%
Apple Trees
$2,800
2,125
675
76%
Coastal Scene
$2,800
2,125
675
76%
Providence Market
Scene
$2,800
2,975
175
106%
N.E. House
$2,800
2.975
175
106%
Providence Market
Scene
7,500
5,950
1,550
79%
Winter Scene
2,500
1,530
970
61%
Autumn Scene
2,500
1,530
970
61%
Fort Scene
2,500
1,360
1,140
54%
Sunset Scene
2,500
1,360
1,140
54%
Spring Scene
2,500
1,530
970
61%
Church Scene
2,500
1,190
1,310
48%
Cape Code Scene
2,500
1,020
1,480
41%
Spring Scene
2,500
1,530
970
61%
Abstract Landscape
2,500
1,190
1,310
48%
Storm Scene
2,500
1,700
800
68% Respondent's major criticism of Vose's valuations is that, in making his appraisal, Vose relied on color photographs of the paintings rather than actually viewing them. We do not consider this a defect in his appraisal technique. Reliance on photographs is not unusual in appraising paintings. Gordon v. Commissioner,T.C. Memo. 1976-274; Posner v. Commissioner,T.C. Memo. 1976-216; Hartwell v. Commissioner,T.C. Memo. 1965-49. In fact, photographs generally serve as the basis for appraisals by the Art Advisory Panel to the Internal Revenue Service. Respondent relies on the testimony and expert report of Rudolf G. Wunderlich to support the valuations determined in the statutory notices of deficiency. Wunderlich was a dealer and appraiser of American art of the 18th, 19th and 20th centuries from 1938 until 1982. He is a leading authority on American Western paintings *333 and bronzes, in particulart, the bronzes of Frederic Remington and Charles M. Russell. In addition to his appraisal work for museums, Wunderlich served on the Art Advisory Panel to the Internal Revenue Service for 2 years. Prior to his work on this case, Wunderlich had never appraised, purchased or sold any Woodward paintings. Respondent's valuations of the 17 Woodward paintings based on costs total $9,000 whereas Wunderlich's total valuation for these paintings is $11,500. For two paintings their valuations are identical; for two respondent's are higher (by $100 and $200) and for the remaining 13 paintings Wunderlich's valuations are higher (ranging from $50 to, in one instance, $1,500). Based on the entire record, we hold that, with one exception, the fair market values of the Woodward paintings in December 1979 are identical to Vose's appraisal valuations, as adjusted. The exception is the painting "Autumn Scene" donated by petitioners Kesselman. In 1984, when viewed by Wunderlich, this painting was damaged. No evidence as to the specific date said damage occurred was proffered. For want of definitive evidence, and based on the limited testimony of Edward Shein, we found *334 that this painting was loaned to, and damaged during shipment to, the El Paso Museum of Art 6 months prior to petitioners Kesselmans' donation. Only Wunderlich considered the damaged condition in valuing this painting. Therefore, we hold that Wunderlich's valuation, $300, accurately reflects the fair market value of the painting "Autumn Scene" as of December 1979. Petitioners have the burden of proving respondent's determinations in the notices of deficiency are incorrect. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). Petitioners offered no testimony or appraisals as to the specific fair market values of the Knaths paintings. We do not accept respondent's witness Wunderlich's valuations of $3,000 of $3,500 per painting due to his limited expertise and experience with Knaths work prior to this proceeding. Therefore, the presumption of correctness attached to respondent's initial determinations remains. Mathias v. Commissioner,50 T.C. at 997-998. Record evidence of sales of other Knaths paintings, in fact, substantiates the accuracy of respondent's determinations. Consequently, we hold that the fair market value of each of the Knaths paintings was $2,400, as determined in *335 the notices of deficiency. Anselmo v. Commissioner,80 T.C. at 885-886. In accord with our decision as to each painting, we hold that the fair market values of the paintings donated to the El Paso Museum of Art by petitioners in 1979 are: Petitioners Lightman
=
$18,360
Petitioners Kesselman
=
8,480
Petitioners Kingsbury
=
9,030
In the notices of deficiency, respondent also determined additions to tax pursuant to section 6653(a). Respondent premises this determination on the failure of any petitioner to testify that due care had been exercised in preparing the returns or to explain the gross overvaluation claims for the donated paintings on petitioners' returns. Petitioners bear the burden of disproving respondent's determination that the negligence addition is applicable. Bixby v. Commissioner,58 T.C. 757, 791-792 (1972). We find that, on the record before us, they have carried their burden. The only fact cited by respondent as indicative of a lack of care is the valuation of the paintings donated by petitioners to the El Paso Museum of Art. Appraisals by a member of the Appraisers Association of America, Inc. supporting the charitable contribution deductions claimed by petitioners were *336 attached to their returns. Although this appraiser was not called to testify and the appraisals have not been accorded any probative weight in our determination of fair market value, nothing in the record indicates they were not made in good faith and justifiably relied on by petitioners. Respondent cites Hanson v. Commissioner,696 F.2d 1232 (9th Cir. 1983), Benningfield v. Commissioner,81 T.C. 408 (1983) and Rice v. Commissioner,T.C. Memo. 1979-294 as support for the negligence determination. Those decisions are inapplicable to this case. Nothing in the record before us indicates that petitioiners' 1979 charitable contribution deductions were part of a tax avoidance scheme that no reasonable person would have trusted. We hold, therefore, that petitioners are not liable for additions to tax pursuant to section 6653(a). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. On grant of the joint motion at the commencement of trial, the following petitioners are consolidated for trial, briefing and opinion: Morris Kesselman and Rita Kesselman, docket No. 9027-83 and Robert S. Kingsbury and Lorraine Kingsbury, docket No. 1707-84.↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the year in issue, and all rule references are to the Tax Court Rules of Practice and Procedure.
3. The record does not reflect any sales of Woodward paintings in 1975 or 1976.
4. Similarly, the Lightmans donation was preceded by a loan to the Museum.↩
5. Although Edward Shein testified he resold most of the approximately 100 Knaths paintings "fast," the record reflects only 18 such sales during the period 1978 through 1980. ↩
6. This includes the paintings sold to petitioners Kesselman and Kingsbury. ↩
7. One of these sales was to petitioners Kesselman. ↩
8. Two such sales were to petitioners Lightman and three such sales were to petitioners Kesselman.↩
9. This painting had been included in several major exhibitions, including ones at the Corcoran Gallery of Art and the National Academy of Design which significantly enhanced its value.
10. In support of this argument, one of petitioner's expert witnesses, Jeffrey R. Brown, testified concerning "the market factors or forces that underlie or influence the prices of art works" in addition to the traditional criteria which influence prices such as quality, size, and condition of a work. While interesting, we are not persuaded that the dichotomy he proposes between orderly and disorderly markets for paintings exists. ↩
11. On brief, petitioners cite a 1980 law review article (Speiller 80 Colum. L. Rev. at 229) which lends support to an estimate that 40 percent of auction sales are made to consumers rather than dealers. Similarly, respondent's expert estimated that at least 50 percent of such sales are to individuals.
12. Petitioners also assert that, in valuing the donated paintings, the values at which said paintings were insured by the El Paso Museum of Art is significant as they represent an "objective estimate of the fair market value" of the paintings and an independent verification of petitioners' valuations. We disagree. Petitioners determined the amounts for which said paintings were initially insured by the museum and, therefore, said amounts have no probative value. Similarly, the insurance values placed on unidentified Woodward paintings at an unspecified time by the Brockton Art Museum are irrelevant to this case.↩
13. Vose's appraisal was in terms of 1984 values rather than 1979, the year of the donations.During trial he stated such appraisals should be adjusted downward by 10-15 percent to obtain the 1979 values. Accordingly, Vose's valuations have been reduced by 15 percent. 14. Contrary to petitioner's assertions, we do not consider Vose's appraisal valuations to be "in substantial accord" with, or "significant substantiation" of, petitioners' return valuations.↩