RAYMOND BIAGIOTTI AND MARY LOU BIAGIOTTI, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE
Biagiotti v. Commissioner
Docket No. 12217-83.
United States Tax Court
T.C. Memo 1986-460; 1986 Tax Ct. Memo LEXIS 142; 52 T.C.M. (CCH) 588; T.C.M. (RIA) 86460; September 22, 1986. *142 Petitioners contributed pre-Columbian or Mayan art objects to the Duke University Museum of Art during the tax years in issue and claimed charitable contribution deductions based on appraisals of said art. Respondent challenges petitioners' valuations. Petitioners also took deductions for the cost of art appraisals relating to the art objects during the tax years in issue, which respondent disputes as to deductibility and verification of amounts expended. Respondent also claims that petitioners are liable for additions to tax under section 6653(a) for failing to maintain adequate records and for relying on appraisals that respondent claims petitioners had reason to know were inflated. Held, the fair market value for petitioners' charitable contributions is that determined by petitioners' expert Dammann. Held further, fees paid by petitioners for art appraisals and expenses related thereto are deductible in part under sec. 212(3). Held further, petitioners are not liable for additions to tax under sec. 6653(a). William H. Kenety and Arthur Rosenberg, for the petitioners. Kenneth A. Hochman, for the respondent. WHITAKER
MEMORANDUM FINDINGS OF FACT AND OPINION WHITAKER, Judge: On *143 February 25, 1983, respondent issued a statutory notice of deficiency to petitioners determining the following deficiencies and additions to tax for the taxable years 1976 through 1980: Addition to Tax
Year
Deficiencies
Section 6653(a) [1]
1976
$5,767.04
$288.35
1977
16,844.00
842.20
1978
23,475.00
1,173.75
1979
29,725.00
1,486.25
1980
25,223.00
1,261.15 In each of the years in issue petitioners donated pre-Columbian or Mayan art objects to the Duke University Museum of Art (Duke), and claimed charitable contribution deductions which respondent disallowed in whole or in part. [2]
Petitioners also claimed deductions for certain appraisal fees and expenses they paid in connection with their art collection, which respondent disallowed in whole or in part. [3]
After concessions, the issues for decision are: (1) The amount deductible for charitable contributions in all years in issue; [4]
(2) whether appraisal fees and expenses paid in connection with petitioners' art collection were properly *144 deductible; and (3) whether petitioners are liable for additions to tax under section 6653(a) for negligence or intentional disregard of rules and regulations. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulated facts and exhibits are incorporated herein. Petitioners Raymond Biagiotti (Biagiotti) and Mary Lou Biagiotti are husband and wife who resided in Boca Raton, Florida, at the time they filed the petition herein. Petitioners filed joint Federal income tax returns for the taxable years 1976 through 1980, inclusive, with either the District Director, Jacksonville, Florida, or the Internal Revenue Service Center, Chamblee, Georgia. Mrs. Biagiotti is a party because she filed jointly with her husband in the years in issue. Biagiotti's interest in Mayan and pre-Columbian art [5] was initiated in 1974 or 1975 when he viewed a collection of pre-Columbian and Mayan art at the home of John Fulling (Fulling), a social acquaintance. Prior to that time he had no exposure to or interest in the art. His career is in public relations and has been since graduation from the University *145 of Florida with a degree in journalism approximately 25 years ago. He has made no formal study of Mayan or pre-Columbian art and has acquired little, if any, expertise in the area. Biagiotti acquired his first piece of pre-Columbian art in 1975 through Fulling from a party named "Estoril." He relied entirely on Fulling for his art acquisitions, and therefore knew nothing about Estoril except that Fulling had a business relationship with Estoril and "November Corporation." Subsequent purchases of Mayan and pre-Columbian art were made through Fulling in 1976, 1977, 1978, and 1979. Generally Biagiotti would inspect groups of items at Fulling's home and then select pieces he found to be attractive. Fulling would quote prices *146 either for individual items or for "lots." On one occasion Biagiotti gave Fulling a $2,500 check in advance with instructions to purchase items worth that sum. Invoices for purchases were provided by Fulling either at the time of purchase or thereafter. November Corporation records were used on occasion to prepare invoices. Biagiotti neither knew nor inquired of Fulling how the prices of items were determined. Some invoices have purchase prices allocated among individual pieces while others are priced in groups. Consequently Biagiotti is unable to determine the individual cost of many items. In an attempt to supplement his records for trial purposes, Biagiotti had his secretary prepare a spread sheet indicating the date and price of items he purchased. The chart was constructed in part by matching both personal and business canceled checks with invoices. In addition, Biagiotti and his secretary used company cash disbursement journals to complete the project.When canceled checks were not found, they relied on the cash disbursement journal for indications that checks had been written. [6] *147 Biagiotti's initial intent was to collect pre-Columbian art for his own use, but in 1976 he decided to follow Fulling's example and contribute parts of his collection to Duke. Bill Stars, the museum director, convinced Biagiotti of the University's commitment to acquire a major collection of Mayan art for study and display. Biagiotti donated his first piece of art in 1976 and additional pieces in 1977, 1978, 1979, and 1980. He continued purchasing pieces during the latter years, selecting for donation those pieces which were of the least interest to him. Value also played a part in his decision of which pieces to donate. Altogether, Biagiotti purchased approximately 200 pieces of art and contributed 25 to 30 percent of those pieces to Duke. At various times throughout the years in issue, Biagiotti had all or part of his art collection appraised. He used the appraisals to determine which pieces to donate to Duke, and also to obtain or change insurance on his *148 collection. [7] In addition, he relied on certain of the appraisals to calculate his charitable contribution deductions on his tax returns. He attached to his return those appraisals he used as a basis for his deductions. In 1978 [8] Biagiotti claimed a deduction for appraisal fees and related expenses which totaled $9,128 and included the following: (1) $188.86 paid April 5, 1978, for pro rata share of appraiser's travel and hotel expenses incurred March 8-16, 1978; (2) $7,201 paid September 28, 1978, for appraisal dated August 5, 1978, covering 30 or 40 major pieces of the collection, and appraiser's travel expenses incurred January 16-21, 1978; and (3) $1,738 paid December 27, 1978, for reappraisal of 1976 contribution and travel expenses incurred September 21-22, 1978. Biagiotti claimed a deduction relating to appraisals and amounting to $2,124 in 1979, which included the following: (1) $174 carried forward from statement dated December 22, 1978, paid December 14, 1979; (2) $892.50 paid December 14, 1979, for appraisal dated January *149 27, 1979, covering eight items of pre-Columbian art; (3) $757.50 paid December 14, 1979, for appraisal dated June 2, 1979, covering five items of Mayan or pre-Columbian art; and (4) $300 paid December 14, 1979. In 1980, Biagiotti claimed a deduction for $600.00 which included the following: (1) $450 paid December 30, 1980, for statement dated December 15, 1980 for "lot" of 10 works of pre-Columbian art; and (2) $150 paid December 30, 1980, for statement dated July 2, 1980. Respondent has conceded that petitioners are entitled to deduct $1,738 in 1978 and $174 in 1979. The sum of $1,738 was paid in 1978 for an appraisal the Biagiottis had done in response to the Government's questions about their 1976 contribution. The sum of $174 was related to an appraisal dated December 20, 1978, which was attached to the Biagiottis' 1978 return, but the sum was not paid until 1979. Although respondent disallowed the remaining deductions for appraisal fees and related expenses, Biagiotti has satisfied us that the $300 paid in December 1979, and the $450 he paid for the December 15, 1980, statement were payments related to the appraisals he attached to his 1979 and 1980 returns, respectively. All *150 of the appraisals of the Biagiotti material during the years in issue were done by James Silberman (Silberman) who had been recommended by Fulling. Biagiotti reviewed Silberman's credentials before arranging to have the appraisals done, and also contacted Bill Stars and asked him to verify that Silberman was a legitimate appraiser with excellent credentials. Although Biagiotti relied on Silberman's appraisals when completing his returns, the latter was not called to testify at trial. Silberman entered into an agreement with the Government subsequent to the years in issue but prior to trial, which prevents him from doing appraisals or testifying about appraisals which involve charitable contributions. [9] Consequently, none of the appraisals done during the years in issue were admitted as evidence of the value of the Biagiotti gift. At the time the appraisals were done and relied upon as a basis for the deductions, Biagiotti was not aware of and did not have any reason to be aware of the events leading to Silberman's agreement with the Government. Biagiotti had never heard anything derogatory about Silberman at the times in question. At trial both parties relied on *151 expert testimony and written reports to establish the value of the Biagiotti contributions. However, because of differences in the factors each relied on, particularly with respect to choice of market prices for comparables, the values arrived at were far apart. [10] Pre-Colombian art is individual work performed by a craftsman or an artist. Each piece has a special meaning within a culture for a particular period, and its individual importance or significance is determined by its condition, painting, and decoration. No two pieces are exactly alike. The best indication of the value of this type of art is the price for which comparable pieces sell. Features to be compared include the period [11] *152 and region from which a piece comes; its condition, extent of restoration, and rarity; its artistic quality; and its sculptural or molded quality. Sales prices of comparable pre-Columbian art vary depending on the type and place of sale. Such art is generally sold in galleries and at auctions, although pieces can be acquired directly from "runners" who bring the art into this country. Fulling acquired his art directly from Guatemala or by traveling to the country of origin and purchasing the art there. The highest prices and most frequent sales are generally found in galleries selling at retail to collectors. Dealers in galleries usually mark up pieces at twice their cost. Collectors, aware of the mark-up, are willing to pay such prices because they rely on the dealer's guarantee of authentic merchandise. In the event authenticity is successfully questioned, galleries will refund the purchase price paid. Gallery owners also advise customers on the development of their personal collections. Auction sales differ significantly from sales in galleries. Auction houses do not guarantee authenticity and they disclaim liability for statements in their catalogs regarding the condition of objects. Prices at auction depend to a large extent *153 on the level of bidding, and it is difficult to label prices as wholesale or retail since collectors, dealers, and occasionally buyers for museums all acquire pieces there. As a result, items purchased may or may not be resold at a later date. For these reasons, auction sales of pre-Columbian art can only be characterized as a mixture of wholesale and retail prices. Petitioner's first expert, Paul Clifford (Clifford) based his appraisal of the Biagiotti material on his general knowledge of sales of comparable pieces. Clifford served as curator of pre-Columbian art at Duke from 1973 until 1981. Since that time, he has maintained his relationship with the museum, changing exhibits and consulting on a volunteer basis. He is a senior member of the American Society of Appraisers, and has been appraising since 1977. He has consulted with a number of institutions on pre-Columbian art, and has published articles on the subject. However, even though he has had considerable exposure to pre-Columbian art, he has had no formal training or study of the art. Prior to his appointment at Duke, he did not hold an official position which involved working with pre-Columbian art. He gained his *154 knowledge of the subject through volunteer work and through the development of his own personal collection, most of which he acquired from galleries in south Florida. He donated this collection to Duke in 1972, with the exception of a few personal pieces. In order to arrive at sales prices of comparable pieces, Clifford consulted available published information. He also relied on his experiences as a collector of pre-Columbian art, as curator at Duke, and as an appraiser. After seeing "thousands of pieces" he put together "pretty much in [his] head" the parameters of the value of pieces comparable to the Biagiotti art. From these, he arrived at what he determined to be fair market value. Petitioners' other expert, Ronald Dammann (Dammann) is an art dealer who specializes in pre-Columbian art. He has been a dealer and appraiser with the Stendahl Galleries in Los Angeles since 1969.His grandfather started the family-owned business, and he has literally grown up around pre-Columbian art. About 90 to 95 percent of the art he deals in, both in appraising and in the gallery, is pre-Columbian. He has customers worldwide and obtains information about sales of pre-Columbian art through *155 customer contact, and also through contact with east and west coast dealers. Dammann valued the Biagiotti art using sales prices of comparable objects he had in his gallery or knew of in other galleries. Dammann valued all of the Biagiotti pieces except items 7.19 and 8.27. [12]
Dammann did not consider sales of comparables at auction houses when he valued the Biagiotti gift, although he personally buys and sells pre-Columbian art for his gallery at the Sotheby Parke Bernet (Sotheby) auction in New York City twice a year. In his opinion, and we so find, Sotheby auction sales do not represent a significant portion of pre-Columbian art sales in this country during these years.We also agree that auction prices at Sotheby generally do not accurately represent the average sales price of pre-Columbian art in the United States. Respondent's expert, Michael Coe (Coe), used auction catalog prices for sales of comparable higher quality pieces, and sales prices in shops and galleries for comparable lower quality pieces. Coe is a professor of anthropology at Yale University. He has been teaching anthropology since 1958, first at the University of Tennessee, and for the last 25 *156 years at Yale. His speciality is pre-Columbian art and the archaeology of Mexico and Central America. More specifically, he specializes in the archaeology of the Olmac civilization of Mexico and the "classic" Mayan civilization. Since 1978, Coe has been Curator of Anthropology at Yale's Peabody Museum of Natural History (Peabody). Peabody has a wide range of collections from dinosaurs to pre-Columbian art. The pre-Columbian collection has been largely acquired by gift, although many pieces have been excavated by archaeologists on the Peabody staff. A few pieces have been acquired by purchase. Prior to his work at Peabody, from 1963 to 1979, Coe was an advisor at the Center for pre-Columbian Studies (Center) at Dumbarton Oaks in Washington, D.C. (Dumbarton). Dumbarton is a study and research center that belongs to Harvard University. The Center is involved with the study of pre-Columbian art and archaeology. Coe rates the pre-Columbian collection at Dumbarton as one of the best in the world in terms of quality, although its collection is limited in size. As advisor at Dumbarton, Coe assisted with the organization of the Center. The Center sponsors conferences on different topics, *157 and Coe helped choose the conference subjects and speakers. He also assisted with the direction of the fellowship program, made purchases for the library, and recommended purchases for the pre-Columbian collection. During his association with the Center, when seeking new pieces for the pre-Columbian collection, Coe traveled to various locations, identified pieces for sale, and attempted to acquire the pieces if reasonably priced. In this process he went to exhibitions, galleries, and auctions. He also had occasion to contact dealers. Coe's advice was sought whenever the Center considered a "major" acquisition, which he describes as those costing more than $20,000. The Center also acquired medium-priced items that were of study interest, and in addition, sometimes purchased items in lots that included pieces of lesser quality. As a professor, Coe has written technical and scholarly articles as well as books on Mexican and Mayan art and culture. Dealers, collectors, and auction houses refer to his books for purposes of authentication, identification, and scholarly assessment. Coe began doing appraisals for the Internal Revenue Service in 1983. He learned about appraisal practice *158 by "simply going and seeing what the art world [was] doing," and talking to other appraisers. He has not read articles written by professionals in the appraisal field, and does not belong to any appraisal associations. In addition, he does not do appraisals for museums other than Peabody, or for private individuals. Since 1983 Coe has spent approximately 10 percent of his time on appraisals. Prior to that time, he spent approximately 1 percent of his time appraising art. He has never operated a gallery that sells pre-Columbian art, nor has his family. [13] He has however, over the past 15 years, advised individuals regarding the purchase of pre-Columbian art, and consulted institutions and museums on such acquisitions. During the last 5 years this consulting consumes approximately 1 hour a week or less of his time. When determining the value of the Biagiotti contributions Coe began by identifying the history and provenance of each piece. In doing so, he relied on his expertise as an archaeologist and anthropologist. He then constructed a chart of price ranges for sales groups of comparable items. He looked for *159 comparable material or material which was superior to the Biagiottis' in auction house sales catalogs. The catalogs contained photographs of the items he determined were comparable. He then broke the comparables into four categories from "top quality" to "poor quality." [14]
He used Sotheby's catalogs exclusively for price ranges of those items within the top three categories. For the lowest group he based prices on what he had seen at shops and galleries that sold items of similar quality, since auctions generally do not list these items in their catalogs or sell them at their main auctions. Using the price ranges he arrived at, Coe then valued each of the Biagiotti items accordingly. ULTIMATE FINDINGS OF FACT Where, as here, auction sales of pre-Columbian art cannot be segregated into their wholesale and retail components, we find that retail sales prices in galleries are the most reliable indicators of the fair market value of such art. Hence, the value of the Biagiotti contributions is the amount as determined in Dammann's *160 revised expert report, except for items 7.19 and 8.27, which Dammann did not value. Respondent disallowed any deduction for items 7.19 and 8.27 in the statutory notice of deficiency, yet respondent's expert valued the pieces at $120 and $100, respectively. The pieces unquestionably had some value; thus, we find that the values of those pieces are not less than the amounts determined by Coe. OPINION Valuation
Where a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property as of the date contributed, reduced when applicable as provided in section 170(e)(1). [15]Sec. 1.170A-1(c)(1), Income Tax Regs. Fair market value is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of the relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs. Fair market value is a question of fact to be determined by an examination of the entire record. Skripak v. Commissioner,84 T.C. 285, 320 (1985). Petitioners bear the burden of proving that the Commissioner's determination of the fair market value *161 of the property involved herein is in error. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). The fair market value of property may vary, depending on the market in which the property is sold. McGuire v. Commissioner,44 T.C. 801, 806 (1965); see Reg. 1.170A-1(c). The determination of the proper market for evaluation purposes is also a question of fact. Anselmo v. Commissioner,757 F.2d 1208, 1213 (11th Cir. 1985), affg. 80 T.C. 872 (1983). Section 170 and the regulations thereunder are silent as to the market to be used in determining the value of donated property. However, we have recognized that the valuation test for estate and gift tax purposes is generally the same as that used for charitable contribution *162 deduction purposes. Anselmo v. Commissioner, 80 T.C. at 881. The regulations for the estate and gift tax valuation test provide that the fair market value of an item of property is to be determined in the market where such items are "most commonly sold to the public." Sec. 20.2031-1(b), Estate Tax Regs.; sec. 25.2512-1, Gift Tax Regs. In the normal situation, a sale "to the public" refers to a sale to the "retail customer who is the ultimate consumer of the property." Anselmo v. Commissioner, 80 T.C. at 882. The sale to the ultimate consumer is any sale to those persons who do not hold the item for subsequent resale, not necessarily the most expensive sale. The most appropriate comparable market for valuation purposes is the most active retail marketplace for the particular item involved. Lio v. Commissioner,85 T.C. 56, 70 (1985). In the present case, the expert witnesses not only provided expert reports, but each testified at length regarding the fair market value of the Biagiotti contributions. We must determine which expert presented the most probative evidence. Although opinion evidence is admissible and relevant on the issue of value, such evidence must be weighed in light *163 of the qualifications of the witness and of all other relevant evidence of value. Anderson v. Commissioner,250 F.2d 242, 249 (5th Cir. 1957), cert. denied 356 U.S. 950 (1958); Johnson v. Commissioner,85 T.C. 469, 477 (1985). We may reject expert testimony when in our best judgment it is appropriate to do so. Helvering v. National Grocery Co.,304 U.S. 282 (1938). Petitioners' expert Dammann is the most reliable witness and presented entirely probative evidence as to the fair market value of the Biagiotti gifts. [16] *164 His sales and pricing experience is far greater than the other two experts' and his disinterested conclusions, as set forth in his amended report, are in our judgment as satisfactory an indication of fair market value as can be obtained from an appraisal. See, e.g., Buffalo Tool & Die Mfg. Co. v. Commissioner,74 T.C. 441, 451-452 (1980). Dammann's extensive experience with both auction and gallery sales makes credible his testimony that auction prices are often lower than gallery prices, and sales at the Sotheby auction represent a small percent of sales in the pre-Columbian art market.
Auction sales of pre-Columbian art in this period, since they were composed of wholesale as well as retail transactions, [17] do not reflect accurately sales prices in the retail market. See Lio v. Commissioner,supra.[18] Respondent argues that no evidence was presented to indicate that Clifford or Dammann utilized a larger or more varied sample for comparable prices than Coe. This argument fails to address the problem of determining whether auction sales prices adequately reflect retail sales. Furthermore, both Dammann and Coe agree that Sotheby sells only a small portion of pre-Columbian art nationwide.We are convinced that Sotheby is the principal auction house selling pre-Columbian art in the United States but we have no evidence as to what percentage of sales are made at auctions other than Sotheby's. Coe testified that he relied on Sotheby catalogs rather than Christie's *165 catalogs since Sotheby is the major auction house for higher quality pre-Columbian art. However, on this record there is no basis for us to determine what percentage of total United States auction house sales of this art the Sotheby sales represented during this period. By contrast to Dammann, we did not find Clifford's testimony to be convincing for a number of reasons. First and foremost, Clifford has not provided a sufficient explanation or justification for the values he attributed to the Biagiotti contributions. He valued the art significantly higher than either of the other experts, but gave only general information about his basis for sales prices of comparable items. We recognize that Clifford may have had significant exposure to pre-Columbian art during his tenure at the Duke museum, *166 and that he holds the status of senior appraiser for the American Society of Appraisers. However, he has no sales experience and no formal training or study of pre-Columbian art. We are not convinced that his background or his contacts with pre-Columbian art have given him the requisite knowledge necessary to value accurately the Biagiotti gift. Without personal retail selling experience, Clifford could only base his valuations on comparable sales. However, his testimony is too vague for us to reach any conclusion as to whether the comparables which he had in his mind were in fact reliable as to type or quality. We thus reject his testimony as to value. See Chiu v. Commissioner,84 T.C. 722, 730 (1985). Dammann's testimony is also far more probative as to value than Professor Coe's. Coe is a well-credentialed expert, and we have no doubt that he is one of the world's principal authorities on the anthropological and archaeological aspects of Mayan and pre-Columbian art. However, we are not satisfied that his expertise extends to the appraisal of such art, especially as to medium and low quality pieces.We are not convinced that his values represent retail sales prices of art comparable *167 to the Biagiotti gift. [19]
Coe relied almost exclusively on auction sale catalog prices for approximately one-half of the Biagiotti contributions, and relied on his general knowledge of the retail market (as did Clifford) for those items that were not suitable for auction. Coe testified that in his opinion, auction sale prices represent the retail price of higher quality pre-Columbian art. We are not convinced that this is accurate, at least as to art objects of the quality here involved. Coe testified that dealers only buy at auction those items which they anticipate retaining for a period long enough for the items to appreciate *168 in value. However, Dammann, who regularly attends auctions, testified that dealers buy at auction with the intent to stock their inventory and resell at a profit. He also testified that as a dealer he does not generally sell at auction because he can get a better price if he sells through his gallery. He will typically sell at auction when he is in need of ready cash.Further, Coe himself admitted that auction prices are an incomplete source of price information, given the entire market of pre-Columbian art sales. Coe's testimony regarding values of those items for which he based his appraisal on sales prices in shops and galleries was as vague as Clifford's.He has failed to convince us that his information is accurate. Coe has had very little exposure to lower quality pre-Columbian art in general. His experiences have centered almost exclusively around higher quality art which he has been called upon to evaluate from an archaeological or anthropological perspective. We thus cannot accept his values as to the lower quality Biagiotti pieces. Dammann's testimony in this case is simply reliable, whereas as we have said, we have substantial problems with that of both Coe and Clifford. *169 Based on the record before us, we conclude that the value of each item of the Biagiotti gift is that value attributed by Dammann in his revised expert report. [20]
Appraisal Fees
There remains in dispute a portion of the deductions for appraisal costs (both fees and travel expense) incurred during the years 1978, 1979, and 1980. Petitioners contend that all of the appraisal costs are deductible as expenses incurred in connection with the determination of their income tax liability since they relied on the appraisals to determine which pieces to donate to Duke. Alternatively, petitioners contend that they should be allowed deductions (in addition to the amounts respondent has conceded) for $300 paid on December 14, 1979, and $450 paid on December 30, 1980. Petitioners argue that these amounts were paid in connection with the appraisals attached to the 1979 and 1980 tax returns, and were therefore incurred in connection with the determination of income tax liability. [21] *170 Respondent does not dispute that amounts paid as appraisal fees in order to determine the fair market value of property contributed for purposes of computing a charitable contribution deduction are deductible under section 212(3) as expenses paid in connection with the determination of income tax liability. Neely v. Commissioner,85 T.C. 934, 950 (1985). [22] However, respondent claims that only those expenses incurred in connection with appraisals actually relied on by petitioners in determining the charitable contribution deductions should be deductible. See sec. 1.170A-13(d)(2)(v), Income Tax Regs. Respondent contends that the only appraisals petitioners actually relied on were those attached to the tax returns, and that except for those amounts respondent has conceded are deductible, petitioners have not proven which fees were paid in connection with appraisals attached to their returns. Respondent also argues that petitioners did not rely on any appraisals not attached to the returns because petitioners have not proven that the appraisals covered items donated either in the year appraised or subsequently. Furthermore, respondent argues that appraisal expenses incurred *171 to identify individual items to be donated are not deductible. According to respondent, such expenses were not paid in connection with the determination of petitioners' income tax liability. We agree with respondent that the only appraisals petitioners actually relied on in determining their charitable contribution deductions were those which were attached to their tax returns. While Biagiotti may have relied on other appraisals to determine which pieces to donate to Duke, he has not proven that those appraisals were performed in connection with the determination of the amount of the charitable contribution deductions. We do not agree with respondent, however, that petitioners failed to prove some of the amounts paid for appraisals attached to the 1979 and 1980 returns. The payments of $300 on December 14, 1979, and $450 on December 30, 1980, are sufficient to support petitioners' deductions. Petitioners have satisfied us that these amounts were paid in connection with the appraisals attached to their 1979 and 1980 return. See Cohan v. Commissioner,39 F.2d 540 (2d Cir. 1930). We hold that petitioners have met their burden of proof with respect *172 to these amounts. Section 6653(a)
The next issue before us is whether petitioners are liable under section 6653(a) for negligence or intentional disregard of rules and regulations. Respondent contends that petitioners were negligent in relying on Silberman's appraisals when they completed their tax returns for the years in issue. Respondent argues that petitioners should have known that the appraised values were inflated in light of the difference between Biagiotti's cost from Fulling and the values Silberman attributed to the art. Secondly, respondent contends that petitioners were negligent or disregarded respondent's regulations by failing to maintain adequate records of the initial cost of the art objects. Sec. 170A-1(a)(2), Income Tax Regs.[23] *173 Section 6653(a) applies only in the event any part of any underpayment is due to negligence or intentional disregard of rules and regulations. [24] *174 Petitioners have the burden of disproving respondent's determination that the section 6653(a) addition to tax is applicable. Bixby v. Commissioner,58 T.C. 757, 791 (1972). With respect to respondent's first argument, petitioners must show that they acted reasonably and prudently and exercised due care in obtaining the appraisals of fair market value which they used on their tax returns. Neely v. Commissioner,85 T.C. 934, 947-948 (1985). On the record before us, petitioners have carried their burden. Although Silberman was not called to testify and his appraisals have not been accorded any probative weight in our determination of fair market value, nothing in the record indicates that petitioners were not justified in relying on Silberman and his appraisals at the time their tax returns were filed. As we stated earlier, at the time the appraisals were relied on, Biagiotti was not aware of the events that led to the later agreement between Silberman and the Government which prohibits Silberman from doing appraisals or testifying about them when they involve charitable contributions. Consequently in no way does the agreement or Silberman's failure *175 to testify bear on the issue of negligence. [25]
Silberman was recommended as an appraiser by a source thought by Biagiotti to be reliable, and Biagiotti verified his credentials with the Duke museum director.Biagiotti had no reason to question Silberman's ability and reliability and knew of nothing at the time that would have led either petitioner to doubt the appraisals. [26] Furthermore, the difference between Biagiotti's cost and Silberman's appraised values does not necessarily indicate that Biagiotti knew or should have known the appraisals were inflated. Biagiotti testified that he thought he was getting a "heck of a deal" when he purchased the art directly from Fulling as it was brought into the country. Biagiotti obviously thought he was paying substantially less than the art was worth.We found him to be a credible witness, and see nothing in the record to indicate that he did know or should have been put on notice that the Silberman appraisals were unreasonable. Respondent *176 has also urged that we find as an "ultimate fact" that petitioners' failure to establish their cost basis in each of the contributed objects was due to negligence or intentional disregard of section 1.170A-1(a)(2), Income Tax Regs. Although Biagiotti maintained inadequate records with respect to the cost basis in the objects contributed, we fail to see how his cost basis in any way relates to the underpayment in this case. Petitioners' underpayment is due to an inaccurate valuation at the time of contribution; the cost basis has nothing to do with the determination of said value. Consequently, we see no connection between the inadequate record keeping and the underpayment of tax in these circumstances. Section 6653(a) is simply not applicable on these facts. Decision will be entered under Rule 155.
APPENDIX A
1976 Adjustments
Respondent's
Amount Shown
Calculation of
Respondent's
Item
On Return
Correct Amount
Adjustment
Contribution $16,250.00
$5,350
$10,900.00
1976 Charitable Contributions
Item
Amount
Allowed/Disallowed
Art Objects - Duke Univ.
Museum of Art
$12,500
$1,600 Allowed
1977 Adjustments
Respondent's
Amount Shown
Calculation of
Respondent's
Item
On Return
Correct Amount
Adjustment
Contributions
$32,742.00
$1,052.00
$31,690.00 "Mayan" Art
Restoration
1,400.00
1,400.00
Insurance on
"Mayan" Art
1,057.00
1,057.00
Sales Tax on
Home Improve-
ments
1,187.00
1,645.00
(458.00)
1977 Charitable Contributions
Item
Amount
Allowed/Disallowed
Cash Contributions
$ 1,052.00
Allowed   Noncash Items-
Clothes etc.
2,215.00
Disallowed
Art Objects - Duke Univ.
Museum of Art
29,475.00
Disallowed
TOTAL
$32,742.00
*177 The parties agree that petitioners' charitable contribution deduction for donations of clothing to St. Vincent de Paul is $1,500.00 for the taxable year 1977. The parties agree that petitioners are to be allowed no deduction for Mayan art insurance or art restoration for 1977. The parties also agree that respondent properly determined the allowable sales tax on home improvements for 1977 to be in the amount of $1,645. 1978 Adjustments
Respondent's
Amount Shown
Calculation of
Respondent's
Item
On Return
Correct Amount
Adjustment
Contributions
$36,866.00
$2,037.00
$34,629.00
"Mayan" Art
Appraisal
9,128.00
9,128.00
Insurance on
"Mayan" Art
2,468.00
2,468.00
"Mayan" Art
Restoration
525.00
525.00
1978 Charitable Contributions
Item
Amount
Allowed/Disallowed
Cash Contributions
$ 2,037.00
Allowed
Art Objects - Duke Univ.
Museum of Art
45,000.00
Disallowed
TOTAL
$47,037.00
Petitioners reduced the amount of their charitable contribution in the amount of $10,171.00 to comply with the statutory limitation on said deductions to 30 percent of adjusted gross income. The net amount on petitioners' joint Federal income tax return for 1978 was $36,866.00. The parties agree that petitioners are to be allowed a deduction in the amount of *178 $1,738 for Mayan art appraisals for 1978. The balance of the deduction claimed by petitioners for taxable year 1978 in the amount of $7,390 remains in controversy. In addition the parties agree that petitioners are to be allowed no deduction for Mayan art insurance or for Mayan art restoration for taxable year 1978. 1979 Adjustments
Respondent's
Amount Shown
Calculation of
Respondent's
Item
On Return
Correct Amount
Adjustment
Contributions
$53,599.00
$2,578.00
$51,021.00
"Mayan" Art
Appraisal
2,124.00
2,124.00
Insurance on
"Mayan" Art
2,236.00
2,236.00
"Mayan" Art
Restoration
1,700.00
1,700.00
1979 Charitable Contributions
Item
Amount
Allowed/Disallowed
Cash Contributions
$ 2,578.00
Allowed   Art Objects - Duke Univ.
Museum of Art
40,850.00
Disallowed
Carryover From 1978
10,171.00
Disallowed
TOTAL
$53,599.00
Respondent concedes that petitioners are to be allowed a deduction in the amount of $174.00 in 1979 for appraisal services rendered in 1978. The petitioners' claimed deduction for Mayan art appraisals in the amount of $1,950 for taxable year 1979 remains in dispute. The parties agree that petitioners are to be allowed no deduction for Mayan art insurance or Mayan art restoration for the taxable year 1979. 1980 Adjustments
Respondent's
Amount Shown
Calculation of
Respondent's
Item
On Return
Correct Amount
Adjustment
Contributions
$46,794.00
$833.00
$45,961.00
"Mayan" Art
Appraisal
600.00
600.00
Insurance on
"Mayan" Art
2,236.00
2,236.00
"Mayan" Art
Restoration
500.00
500.00
Interest
1,551.00
2,722.00
1,171.00
1980 Charitable Contributions
Item
Amount
Allowed/Disallowed
Cash Contributions
$ 833.00
Allowed   Out-of-Pocket Expense
59.00
Disallowed
St. Vincent de Paul
820.00
Disallowed
Art Objects - Duke Univ.
Museum of Art
64,000.00
Disallowed
TOTAL
$65,712.00
Petitioners *179 reduced their charitable contributions in the amount of $18,918 to reflect the statutory limitation on said deduction to 30 percent of adjusted gross income.The net amount claimed on petitioners' return was $46,794. In addition, for 1980, the parties stipulated to the following: (1) Petitioners are to be allowed a charitable contribution deduction for donations of clothing to St. Vincent de Paul in the amount of $550 for 1980. (2) Petitioners are to be allowed no deduction for Mayan art insurance or art restoration for the year 1980. (3) Petitioners are to be allowed no charitable contribution deduction for claimed out-of-pocket expenses in the amount of $59 for taxable year 1980. (4) Petitioners' interest income for 1980 was $1,551. APPENDIX B - EXPERTS' VALUATION (1976)
Dammann
Dammann
Item
Clifford
Original
Revised
Coe
1 & 2
a. b.
$15,000
$2,500
$3,500
$400
(1977)
Dammann
Dammann
Item
Clifford
Original
Revised
Coe
5.1
$ 7,500
$ 1,500
$ 1,800
$1,000
7.1
850
500
500
350
7.3
1,750
900
900
400
7.4
6,000
2,500
2,500
1,500
7.5
1,500
1,200
1,200
700
7.7
3,500
2,000
2,000
900
7.18
400
400
400
145
7.19
600
120
7.20
900
300
300
100
7.21
600
300
300
120
7.22
1,500
175
175
375
7.23
1,125
250
250
100
7.24
600
200
200
160
7.25
885
500
500
40
7.26
300
150
150
80
7.29
1,250
500
500
300
7.30
750
250
250
20
7.33
1,000
400
400
200
7.37
600
300
300
250
TOTAL
$31,610
$12,325
$12,625
$6,860
*180 (1978)
Dammann
Dammann
Item
Clifford
Original
Revised
Coe
RB06
$ 1,600
$ 600
$ 600
$ 150
7.38
5,150
600
600
155
8.14
2,500
1,500
1,500
50
8.15
750
250
250
100
8.16
1,500
500
500
50
8.17
1,500
600
350
300
8.18
2,000
1,500
1,500
150
8.19
750
400
400
125
8.20
150
100
100
20
8.21
250
200
200
100
8.22
250
200
200
150
8.23
950
350
350
100
8.24
175
200
200
150
8.26
750
300
300
125
8.27
100
8.28
4,500
2,500
2,500
800
8.29
2,500
1,000
500
2,000
8.30
1,500
1,000
1,000
800
8.31
5,000
3,000
3,000
1,000
8.33
2,500
1,500
1,500
2,000
8.34
2,250
1,800
1,200
300
8.36
2,500
750
750
500
8.37
2,750
1,200
1,200
400
8.38
1,750
1,000
1,000
500
TOTAL
$43,525
$21,050
$19,700
$10,125
(1979)
Dammann
Dammann
Item
Clifford
Original
Revised
Coe
RB20
$ 7,500
$ 1,500
$ 200
7.25
350
500
500
40
8.41
9,500
3,350
4,000
4,000
8.42
8,500
2,500
3,000
2,500
8.44
10,500
4,500
4,500
3,500
TOTAL
$36,350
$10,850
$13,500
$10,240
(1980)
Dammann
Dammann
Item
Clifford
Original
Revised
Coe
CG03
$17,500
$ 5,000
$ 6,000
$ 3,000
CG16
4,500
2,500
3,000
5,000
CG19
7,500
3,500
4,500
7,000
8.12
1,500
1,500
1,500
8.13
7,000
2,000
3,000
5,000
8.35
8,500
2,750
2,750
1,000
8.45
6,000
2,000
1,200
400
8.46
9,000
2,500
1,500
350
TOTAL
$61,500
$21,750
$23,450
$21,750
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all rule references are to the Tax Court Rules of Practice and Procedure.↩
2. See Appendix A.↩
3. See Appendix A.↩
4. The parties agree that the donee in this case was a qualified organization.↩
5. Technically "Mayan art" and "pre-Columbian art" are not synonymous terms. Mayan art is part of pre-Columbian art. The word pre-Columbian is used for the art of the Indians of Mexico and Central and South America before the Spanish Conquest. The Mayan civilization was a branch of the civilization of Mexico and Central America and therefore Mayan art is only one branch of pre-Columbian art. Mayan art is the most highly prized pre-Columbian art among collectors.↩
6. Respondent spent considerable time cross-examining Biagiotti about inconsistencies in the spread sheet and about the cost of items purchased. Biagiotti could and should have maintained better records. However, the spread sheet and cost of individual items are not material to the determination of value in this case.
7. Donated pieces were routinely eliminated from insurance coverage.↩
8. The parties do not dispute the deductibility of appraisal fees in either 1976 or 1977.↩
9. See Exhibit 28AB.↩
10. See Appendix B. ↩
11. Pre-Columbian art is dated according to the following timeline: (1) Formative period, 1000 B.C. to 300 B.C. (2) late formative, 400 B.C. to 300 B.C. (3) pre-classic and minor break into proto-classic, 300 B.C. to 300 A.D. (4) early classic, 300 A.D. to 600 A.D. (5) late classic, 600 A.D. to 900 A.D. (6) classic, 300 A.D. to 900 A.D. (7) post-classic, 900 A.D. to Spanish Conquest (8) post-conquest, 1500 A.D. to present↩
12. See Appendix B.↩
13. There was no evidence that Coe has ever operated any type of gallery.↩
14. A = Top Quality B = Good Quality C = Fair Quality D = Poor quality. (Items that would not be taken by an auction house and were not found in auction catalogs.)↩
15. The parties do not dispute that petitioners held the contributed property sufficiently long to receive long-term capital gains treatment if sold. Consequently, section 170(e)(1)(A) is not applicable in this case. Furthermore, the parties do not raise the applicability of section 170(e)(1)(B)↩, we presume because Duke University is a recognized educational institution qualifying as a public charity. See IRS Pub. 78, Cumulative List of Organizations (Rev. 1-86), p. 328.
16. We reject respondent's contention that we should disregard Dammann's opinion because his values were based on current fair market value rather than fair market value at the time the art was contributed. Dammann's expert report states that his appraisal was prepared in accordance with respondent's regulations and he testified that his values reflected fair market value at the date of contribution.
17. Coe admitted himself that it is difficult to talk in terms of wholesale and retail prices at auction because it depends on the bidding that takes place. ↩
18. See also McGuire v. Commissioner,44 T.C. 801 (1965); Peterson v. Commissioner,T.C. Memo. 1982-438. Auction house prices may very well be relied upon in other circumstances. See, e.g., Mathias v. Commissioner,50 T.C. 994, 999↩ (1968).
19. Professor Coe spent considerable time testifying about the proper identification of items in the Biagiotti gift. He disagreed numerous times with the descriptions provided in Clifford's expert report (and relied upon by Dammann).While we do not doubt that Coe was the most qualified of the experts to accurately identify the origin and era or the art pieces, we are convinced that ultimately, these descriptions have far less impact on the fair market values of the items than respondent attributes to them. Compare Isbell v. Commissioner,T.C. Memo. 1982-534↩.
20. See Ultimate Findings of Fact, supra,↩ regarding items 7.19 and 8.27 which Dammann failed to value.
21. Petitioner did not claim any deduction for appraisal fees in 1976, and respondent did not dispute petitioner's deduction in 1977.
22. Rev. Rul. 67-461, 1967-2 C.B. 125↩.
23. Sec. 1.170A-1(a)(2)(ii), Income Tax Regs. provides: Contribution by individual of property other than money. If an individual taxpayer makes a charitable contribution of an item of property other than money and claims a deduction in excess of $200 in respect of his contributions of such item, he shall attach to his income tax return the following information with respect to such item: * * * (f) The cost or other basis, adjusted as provided by section 1016, of property, other than securities, held by the taxpayer for a period of less than five years immediately preceding the date on which the contribution was made and, when the information is available, of property, other than securities, held for a period of five years or more preceding the date on which the contribution was made. (g) In the case of property to which section 170(e) applies, the cost or other basis, adjusted as provided by section 1016, the reduction by reason of section 170(e)(1)↩ in the amount of the charitable contribution otherwise taken into account, and the manner in which such reduction was determined.
24. Section 6653(a) provides: If any part of any underpayment (as defined in subsection (c)(1)) of any tax imposed by subtitle A, by Chapter 12 of subtitle B (relating to income taxes and gift taxes), or by Chapter 45 (relating to windfall profit tax) is due to negligence or intentional disregard of rules and regulations (but without intent to defraud), there shall be added to the tax an amount equal to 5 percent of the underpayment.
25. No evidence was submitted to us from which we can judge the validity or reasonableness of respondent's position as to Silberman. Hence, we express no opinion on Silberman as an appraiser.↩
26. See Lightman v. Commissioner,T.C. Memo. 1985-315↩.