February 9, 1993
 United States Court of Appeals
 For the First Circuit
 
No. 92-1513

 HOMER F. AND DOROTHY L. MCMURRAY,
 Petitioners, Appellants,

 v.

 COMMISSIONER OF INTERNAL REVENUE,
 Respondent, Appellee.
 

 APPEAL FROM THE UNITED STATES TAX COURT
[Hon. Theodore Tannenwald, Jr., United States Tax Court Judge]
 
No. 92-1628

 HOMER F. AND DOROTHY L. MCMURRAY
 Petitioners, Appellants,

 v.

 COMMISSIONER OF INTERNAL REVENUE,
 Respondent, Appellee.
 

 APPEAL FROM THE UNITED STATES TAX COURT
 [Hon. Stephen J. Swift, United States Tax Court Judge]
 

 Before

 Torruella, Circuit Judge,
 
 Bownes, Senior Circuit Judge, and
 
 Stahl, Circuit Judge.
 
Aline H. Lotter for appellants.
 

Gary R. Allen with whom James A. Bruton, Acting Assistant
 
Attorney General, Tax Division, Department of Justice, Bruce R.
 
Ellisen, and William J. Patton and Abraham N.M. Shashy, Jr. were on
 
brief for appellee. 

 February 9, 1993
 

 STAHL, Circuit Judge. In these consolidated
 

appeals, Dorothy L. McMurray and Homer F. McMurray ("the

McMurrays"), challenge decisions of the United States Tax

Court which upheld determinations made by the Commissioner of

Internal Revenue ("the Commissioner") that the McMurrays are

jointly liable for income tax deficiencies for 1984 through

1988, as well as penalties stemming from those deficiencies.

The deficiencies are based on the Commissioner's conclusion

that the McMurrays overstated the value of certain charitable

land donations. For the reasons that follow, we affirm the

deficiency determinations, but reverse a portion of the

penalty assessments.

 I.
 

 Background
 

 The central issue in this case is the amount of

charitable deduction to which the McMurrays are entitled as a

result of donating property known as the Ponemah Bog,1 in

Amherst, New Hampshire ("the Bog"), to the Audubon Society of

New Hampshire ("Audubon"). The McMurrays, who are husband

 

1. Ponemah is a "kettle hole" bog, formed by glaciers over
12,000 years ago. As the climate warmed and the glaciers
receded, vegetation grew on the edges of a pond formed by the
melting blocks of ice. Although the pond was too deep and
steep-sided to support the growth of many types of marsh
plants, some, such as sphagnum (peat) moss, were able to grow
out over the edge of the pond and float on the surface.
Eventually, a peat mat formed on the surface, which became
thick enough to support shrubs and stunted trees. Over the
course of thousands of years, the pond gradually filled with
peat and the remains of dead vegetation.

 -2-
 2

and wife, in 1954 acquired the approximately 72-acre Bog and

other contiguous parcels of land.

 In February 1978, Audubon solicited from the

McMurrays2 a donation of the Bog, in order to ensure its

perpetual preservation. The McMurrays agreed, and in 1979,

1982 and 1985 conveyed their interests in the Bog and an

abutting residential lot to the Audubon Society in four

separate transactions. Only the value of the 1982 and two

1985 conveyances are at issue in this case.

 In 1979, the McMurrays conveyed the eastern 24.6

acres of the Bog to Audubon. In April 1982, the McMurrays

conveyed a 65 percent interest in the remaining 47.57 acres

of the Bog. On their joint federal income tax return for

1982, the McMurrays claimed that the fair market value of

their contribution to Audubon was $780,000. They based this

valuation on a "letter of opinion" from appraiser Patricia J.

Donovon, who concluded that the fair market value of the

property was $25,000 to $27,000 per acre, or between $750,000

and $800,000. The McMurrays took a $118,981 deduction on the

1982 return, and calculated that $349,019 would be carried

over to future years. 

 

2. The record indicates that Homer F. McMurray was the
principal actor in all Bog-related transactions. However,
because their joint-taxpayer status places both McMurrays
before us, we refer to all actions as though they were done
jointly.

 -3-
 3

 In September 1985, after carrying over deductions

of $122,458 and $117,721, respectively, on their 1983 and

1984 returns, the McMurrays conveyed to Audubon the remaining

35 percent interest in the Bog. In December 1985, they

transferred a one acre residential lot abutting the Bog. In

March 1986, Donovon provided the McMurrays with an appraisal

for the two 1985 donations. Donovon increased the price per

acre to $35,000, and concluded that the 35 percent interest

in the Bog had a value of $580,000. She valued the

residential lot at $55,000 to $60,000, resulting in a total

1985 charitable conveyance value of $635,000 to $640,000.

 On their 1985 return, the McMurrays claimed a value

of $637,500 for the donated property. They used the

remaining $123,200 carryover from the 1982 donation, and

claimed $10,636 from the 1985 transfers on their 1985 return,

leaving a $371,864 carryover. The McMurrays claimed

deductions of $170,597 in 1986, $135,115 in 1987, and $76,788

in 1988.

 Upon conducting an examination of the McMurrays' returns

for 1984, 1985 and 1986, the Commissioner determined that the

fair market value of the 1982 conveyance was $23,200, rather

than $780,000, as the McMurrays claimed. Accordingly, the

Commissioner ruled that there was no carryover from 1982 to

either 1983 or 1984, and thus no deduction allowable for

1984. The Commissioner also ruled that the fair market value

 -4-
 4

of the 1985 Bog transfer was $6,250, as opposed to the

$580,000 the McMurrays claimed; and that the value of the

residential lot transferred the same year was $35,000 rather

than $57,500, as claimed by the McMurrays. Based on these

figures, the Commissioner determined that the McMurrays were

entitled to a 1985 deduction of $24,750, and that no

carryovers were available for future years. Thus, the

Commissioner found deficiencies for 1984, 1985 and 1986. The

Commissioner also asserted additions to tax under I.R.C. 

6653 for negligence and intentional disregard of rules and

regulations, and under I.R.C. 6659 for underpayment of tax

attributable to a charitable valuation overstatement. The

Commissioner subsequently determined tax deficiencies for

1987 and 1988, as well as additions to tax under sections

6653 and 6659.3

 

3. The deficiencies and additions to tax determined by the
Commissioner and upheld by the Tax Court are as follows:

 Sec. Sec. Sec. Sec.
 6653 6653 6653 6653 Sec.
 Year Def. (a)(1) (a)(2) (a)(1)(A) (a)(1)(B) 6659 
 
 1984 $65,327 $3,266 * - - $19,598

 1985 $53,552 $2,676 * - - $16,058
 1986 $85,176 - - $4,259 * $25,553

 1987 $50,539 - - $2,527 * $15,162

 1988 $22,981 - - $1,149 * $ 6,894

 * penalty assessed is 50 percent of the interest due on
the deficiency.

 -5-
 5

 In March 1990, the McMurrays filed a petition in

the tax court seeking a redetermination of the 1984, 1985,

and 1986 deficiencies. On March 19, 1992, the tax court

ruled against the McMurrays (Appeal No. 92-1513). Meanwhile,

in March 1991, the McMurrays had sought redetermination of

their 1987 and 1988 deficiencies. The Commissioner filed a

motion for summary judgment in the 1991-filed case, claiming

that the McMurrays were collaterally estopped by the decision

in the 1990 case from relitigating the 1985 contributions.

On April 23, 1992, the tax court granted the Commissioner's

motion for summary judgment (Appeal No. 92-1628). These

appeals followed.4

 II.
 

 Discussion
 

A. The Deficiencies
 

 Section 170 of the Internal Revenue Code ("the

Code") allows taxpayers to deduct charitable contributions

subject to percentage-of-income limitations and to carryover

excess contributions. If a charitable contribution is made

of property other than money, the amount of the contribution

is the fair market value of the property at the time of the

contribution. Treas. Reg. 1.170A-1(c)(1). Fair market

value is "the price at which the property would change hands

 

4. In their reply brief, the McMurrays indicate their
abandonment of the collateral estoppel issue. Thus, our
decision here will apply to both cases.

 -6-
 6

between a willing buyer and a willing seller, neither being

under any compulsion to buy or sell, and both having a

reasonable knowledge of relevant facts." Treas. Reg. 

1.170A-1(c)(2). The Commissioner's determination of the fair

market value of donated property is presumptively correct,

and the taxpayer has the burden of proving the Commissioner's

determination to be erroneous. Welch v. Helvering, 290 U.S.
 

111, 115 (1933); Pescosolido v. Commissioner, 883 F.2d 187,
 

189 (1st Cir. 1989). The fair market value of property is a

reflection of the "highest and best use" of the property on

the date of valuation. Symington v. Commissioner, 87 T.C.
 

892, 896 (1986); Stanley Works v. Commissioner, 87 T.C. 389,
 

400 (1986). The tax court's ruling with respect to fair

market value is a factual finding that we must affirm unless

it is clearly erroneous. Sammons v. Commissioner, 838 F.2d
 

330, 333 (9th Cir. 1988); Ebben v. Commissioner, 783 F.2d
 

906, 909 (9th Cir. 1986). 

 Here, both sides agree the highest and best use of

the Bog is as a natural preserve. The McMurrays, however,

believe the commercial value of the peat contained in the Bog

should be taken into account in any valuation.5 In support

of their theory, the McMurrays submitted to the tax court

appraisals by Boston College Coastal Research Institute

 

5. According to record evidence, peat can be used as a fuel
source for electric power generation.

 -7-
 7

Professor Dr. Benno Brenninkmeyer, Richard Kasevich, chief

financial officer of a Maine peat-mining operation, and

botany professor Ian Worley.6 Brenninkmeyer estimated the

value of the peat in the Bog, as a fuel resource, to be

greater than $35 million; Worley calculated the profit

potential of harvesting the peat; Kasevich compiled a pro
 

forma income statement demonstrating the profitability of a
 

hypothetical harvesting operation on the Bog.

 Before the tax court, the Commissioner relied

exclusively for the valuation of the gift on the appraisal of

Joseph G. Fremeau. After giving much weight to the presence

of state and local zoning restrictions on the use of the Bog,

and interviewing several people involved in the variance and

permitting process, Fremeau opined that any request for a

permit to harvest the peat or otherwise develop the Bog would

have met substantial opposition during the relevant time

period and would have had little chance of success.

Accordingly, Fremeau's valuation focused on sale prices of

eight other supposedly comparable wetland properties suitable

for conservation purposes and which had sold at prices

 

6. Although the Tax Court considered the Donovon appraisals
accompanying the McMurrays' tax returns as part of the peat
valuation theory, it is evident from the record that the
McMurrays essentially abandoned reliance on Donovon before
the Tax Court and included her appraisal only as part of
their argument against penalties, see infra. Thus, for
 
purposes of our examination of the peat valuation evidence,
we discuss neither Donovon's work, nor the Tax Court's
criticism thereof.

 -8-
 8

between $200 and $800 per acre. Fremeau concluded that the

Bog had a value of $400 per acre, for a total of $12,500 for

the 1982 transfer, and $6,700 for the 1985 transfer. With

respect to the residential lot, Fremeau evaluated 20

comparable sales and found a range in the Amherst area of

$22,533 to $58,000. As the lot in question is smaller than

many other Amherst house lots and is encumbered by a right-

of-way easement owned by Audubon, Fremeau's $35,000 valuation

fell toward the lower end of the scale.

 In the end, the tax court found the McMurrays'

evidence inadequate because, unlike Fremeau, none of their

experts took into account the restrictions on harvesting the

peat or the costs associated with such an operation. Thus,

the court concluded that the McMurrays failed to carry their

burden of proving that the value of the Bog exceeded the

Commissioner's determination. Based on our review of

pertinent case law, we cannot say the tax court's ruling was

clearly erroneous.

 It is well settled that legal restrictions on

development or other encumbrances diminish a property's fair

market value. For example, in Great Northern Nekoosa Corp.
 

v. United States, 711 F.2d 473 (1st Cir. 1983), a taxpayer
 

donated a parcel of land to the State of Maine for which he

claimed a fair market value of $1 million based on his

expert's valuation of the property as a site for a

 -9-
 9

hydroelectric power plant. Prior to the donation, however,

the National Wild and Scenic Rivers Act, 82 Stat. 906 (1968),

was enacted, which could have barred, inter alia, such
 

construction, a fact not considered by the taxpayer's

appraisal. We concluded that the taxpayer's valuation could

not be the fair market value "inasmuch as any rational

prospective purchase would necessarily take into account the

potential realization of that encumbrance." Id. at 475.
 

Therefore--despite our less than complete satisfaction with

the Commissioner's expert appraisal--we concluded that the

taxpayer failed to bear its burden of proving a valuation

higher than that of the Commissioner.

 Here, too, we have a taxpayer appraisal that fails

to consider potential legal obstacles toward fulfilling the

property's full monetary potential. Moreover, as the

Commissioner points out, the McMurrays' experts also failed

to consider many other aspects of a peat mining operation in

arriving at their conclusion.7 Thus, given the shortcomings

 

7. For example, Brenninkmeyer reached his $35 million
conclusion by multiplying the Bog's estimated volume by $145
per ton, which was the average retail price of coal in 1989.
He failed, however, to assess the market for peat during the
relevant time period, or the costs and feasibility of a
complete peat extraction. Kasevich's income statement was
based on the 1990 peat harvesting figures of his own company,
but did not include any potential overhead costs. Worley,
relying on Kasevich's income statement, assumed, without
factual support, that all equipment could be purchased
outright, and thus did not consider financing costs.
Significantly, both Kasevich and Worley alluded to the fact
that successes in the peat harvesting business were few, and

 -10-
 10

of the McMurrays' experts' reports, the tax court's

conclusion that the McMurrays failed to carry their burden

was not clearly erroneous.

 In the alternative, the McMurrays argue that if

state and local regulatory constraints deprive them of the

Bog's economic potential, then they are entitled to just

compensation under the United States Constitution in return

for a regulatory taking. See Lucas v. South Carolina Coastal
 

Council, U.S. , 112 S. Ct. 2886 (1992). Even assuming
 

that Lucas would turn the regulations involved here into a
 

"taking," the short answer is that the McMurrays have

overlooked the fact that any such "taking" was performed by

state and local authorities, and as such gives them no right

to seek compensation--via tax deductions--from the United

States, an entirely different sovereign. Moreover, to the

extent that the McMurrays argue for including the value of an

inverse condemnation suit against the State of New Hampshire

in the Bog valuation, the tax court correctly concluded that

the success of such a suit is not as assured as the McMurrays

declare, and that the record is "devoid of any evidence

 

that most of the peat harvesting operations of which they
were aware had failed. While Kasevich's Down East Peat Co.
was an apparent exception, we cannot quarrel with the Tax
Court's conclusion that reliance on Down East's financial
performance to estimate the McMurray's potential success is
"like saying that anybody opens a hamburger chain and you
estimate the profit potential by what McDonald's does." 

 -11-
 11

directed toward valuing any such claim." Thus we find the

tax court did not err in rejecting this argument.

 Finally, the McMurrays argue that the tax court's

reliance on Fremeau's use of comparative sales to value the

Bog was inappropriate due to the Bog's uniqueness. Instead,

the McMurrays, relying on Estate of Palmer v. Commissioner,
 

839 F.2d 420 (8th Cir. 1988), assert that the Bog's

replacement cost would be a better method. We disagree. The

McMurrays, unlike the taxpayers in Palmer, have provided no
 

evidence of replacement cost and thus we find no clear error

in the tax court's reliance on Fremeau's evaluation method.8

 Accordingly, we affirm the tax court's decision to uphold

the Commissioner's deficiency determinations.9

 

8. While it is true that Fremeau's comparative properties
were not identical to the Bog in some respects, the Tax Court
found that they were the most comparable for the relevant
time and place. See Symington, 87 T.C. at 900 (in the
 
absence of identical properties, comparable sales method
takes into account differences, and through appropriate
adjustment, arrives at a value for the subject property). As
the record demonstrates that the compared properties were
also non-developable wetlands, and that state Fish and Game
and Forest Protection Society personnel held at least two of
the properties in the same high esteem as the Bog, we find
the Tax Court's endorsement of Fremeau's methodology
eminently supportable. See Anselmo v. Commissioner, 757 F.2d
 
1208, 1213 (11th Cir. 1985) (Tax Court's determination of
proper comparable market is a question of fact subject to
reversal only if clearly erroneous). 

9. The McMurrays have not addressed any appellate argument
to the valuation of the residential lot transferred in 1985.
Therefore, we deem the argument abandoned. See, e.g., United
 
States v. Slade, No. 92-1176, slip op. at 6, n.3 (1st Cir.
 
Nov. 24, 1992).

 -12-
 12

B. Additions to Tax and Penalties
 

 1. Negligence
 

 Section 6653(a)(1) of the 1954 Code and Section

6653(a)(1)(A) of the 1986 Code impose an addition to tax of

five percent of an income tax underpayment where any part of

the underpayment is due to negligence or intentional

disregard of rules or regulations. Section 6653(a)(2) of the

1954 Code and Section 6653 (a)(1)(B) of the 1986 Code impose

a penalty of 50 percent of the interest due on the portion of

any underpayment attributable to negligence.10 Negligence

in this context is a lack of due care or failure to do what a

reasonable and ordinarily prudent person would do under the

circumstances. Allen v. Commissioner, 925 F.2d 348, 353 (9th
 

Cir. 1991). The Commissioner's imposition of a negligence

addition is presumptively correct, leaving the McMurrays with

the burden of proving that their underpayment was not due to

negligent or intentional rules violations. Leuhsler v.
 

Commissioner, 963 F.2d 907, 910 (6th Cir. 1992). 
 

 The McMurrays argue, as they did below, that their

good faith reliance on Donovon--a professional real estate

appraiser--for the valuations stated on their 1982 and 1985

returns justifies reversal of the extra assessment. The tax

 

10. The relevant statutes were renumbered for taxable years
in which a return is due after December 31, 1986. Their
substance remained the same, however. See Tax Reform Act of
 
1986, Pub. L. No. 99-514, 1503(a), 100 Stat. 2085.

 -13-
 13

court, however, found that the McMurrays did not sufficiently

establish that they reasonably relied on Donovon's

appraisals, "beyond the bare fact that the [] appraisals were

attached to the [] returns." The court then combined four

factors--its disparaging view of Donovon's report, the

McMurrays' failure to testify as to their reliance, their

abandonment of her appraisals at trial, and evidence of the

McMurrays' knowledge of real estate development in the

Amherst area--to conclude that they had failed to demonstrate

their reasonable reliance. We disagree.11

 Reasonable reliance on expert opinion, asserted in

good faith, can shield a taxpayer from section 6653(a)

penalties. United States v. Boyle, 469 U.S. 241, 250 (1985);
 

Collins v. Commissioner, 857 F.2d 1383, 1386 (9th Cir. 1988);
 

Betson v. Commissioner, 802 F.2d 365, 372 (9th Cir. 1986).
 

The record reflects that after being approached by Audubon,

the McMurrays sought professional advice from lawyers and

accountants, as well as an appraiser. In our view, the "bare

fact" that the McMurrays attached Donovon's appraisals to

support their 1982 and 1985 returns is evidence of their
 

reliance on the appraisals. In other words, why else were

they submitted with the returns, but for the fact that the

 

11. It is unclear from the record whether the Tax Court was
questioning the McMurrays' actual reliance on Donovon, or
whether any such reliance was reasonable. With that in mind,
we will delve into both areas.

 -14-
 14

McMurrays were relying on them? Furthermore, we fail to see

how any of the other factors cited by the tax court are

probative of the McMurrays' reliance. For instance, the fact

that the McMurrays pursued a different legal tack at trial in

1991 has little bearing on the reasonableness of their

actions in 1982 and 1985. Also, while the McMurrays may have

some knowledge as to "real estate development," the record

evidence of such knowledge falls far short of requiring them

to second-guess a licensed appraiser--especially one whose

1979 appraisal apparently passed muster with the Commissioner

as support for the deductions taken for the 1979 conveyance.

Finally, we note that the minimal probative value assigned by

the tax court to the McMurrays' expert opinion does not

mandate a finding of bad faith or unreasonable reliance. See
 

Sammons, 838 F.2d at 337 (although taxpayer's expert
 

appraisal was not entitled to any probative weight in

determining the fair market value of a charitable

contribution, imposing a negligence penalty was inappropriate

because taxpayers had no reason to question their expert's

ability) (citing Biagiotti v. Commissioner, 52 T.C.M. (CCH)
 

588, 595 (1986)). We conclude, therefore, that the record

lacks sufficient evidence of bad faith to support the tax

court's negligence ruling, and instead compels a finding that

the McMurrays met their burden of proof on this issue.

 2. Valuation Overstatement
 

 -15-
 15

 Section 6659 of the Code imposes an addition to tax

if the amount of any underpayment of $1,000 or more is

attributable to a valuation overstatement of charitable

deduction property.12 For purposes of this section, a

valuation overstatement exists where the claimed value is 150

percent or more of the amount determined to be correct.

I.R.C. 6659(c)(1). Here, the McMurrays claimed a donation

value of $803,933 in 1982, and a value of $637,500 in 1985.

The tax court, however, ruled that the values were $12,500

and $41,700, respectively. These figures place the

McMurrays' overstatement beyond the 150 percent threshold of

section 6659. 

 The McMurrays seek relief under section 6659(e),

which allows for a waiver of "all or any part of the addition

to tax provided by this section on a showing by the taxpayer

that there was a reasonable basis for the valuation or

adjusted basis claimed on the return and that such claim was

made in good faith." While we have already concluded that

the McMurrays acted in reasonable reliance on the Donovon

appraisal, the inquiry does not end there, because section

6659(f)(2) prohibits a penalty waiver unless "the claimed

value of the property was based on a qualified appraisal made

by a qualified appraiser," and, "in addition to obtaining
 

 

12. The assessed penalty is 30 percent of the underpayment
attributable to the valuation overstatement.

 -16-
 16

such an appraisal, the taxpayer made a good faith

investigation of the value of the contributed property." On

appeal, the McMurrays do not address section 6659(f)(2), nor

does our review of the record indicate any additional

investigation by the McMurrays into the value of the

property. Thus, we affirm the imposition of penalties under

section 6659.

 III.
 

 Conclusion
 

 The tax court's decision with respect to the

Commissioner's deficiency determination and additions to tax

under I.R.C. 6659 is affirmed. The decision with respect
 affirmed
 

to the negligence penalties under I.R.C. 6653(a) is

reversed. This case is remanded to the Tax Court with
reversed
 

instructions to enter a decision in accordance herewith.
 

 -17-
 17